IN THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF MISSISSIPPI

In Re:  LITTCO Metals, LLC                      Case No.:  23-10069-SDM
       Debtor(s)                               Chapter 7
                                    Adversary Proceeding No.: 24-01024-SDM

---

JASON LITTRELL, LITTCO, LLC,
AND WILLIAM L. FAVA, TRUSTEE
FOR LITTCO METALS, LLC                                              PLAINTIFFS

V.

TYLER BURGESS; TONIA ETOH;
INTERNATIONAL DEVELOPMENT
SERVICES, INC.; INTERNATIONAL
SERVICES, INC.; TAVAS, LLC;
PENHURST CAPITAL, INC.; TIM WILLITS;
NATHAN FREE; JEROLD WEISSBERG;
ROBERT LEGON; BRUCE BUSH; DALE
JOHNSTON; JAMES PETERS; BYZFUNDER
NY, LLC; NEWCO CAPITAL GROUP IV, LLC;
MEHANDI VAKIL; WISE VENTURE, LLC;
STEVEN MARKOWITZ, JR.; SAMSON, MCA,
LLC; CLOUDFUND, LLC D/B/A SAMSON
GROUP; UNIQUE FUNDING SOLUTIONS,
LLC; YAAKOV WINOGRAD; PROSPERUM
CAPITAL PARTNERS, LLC D/B/A ARSENAL
FUNDING; JOHN AND JANE DOES 1-10;
AND ENTITIY DOES 1-5                                                DEFENDANTS

## SECOND AMENDED COMPLAINT

COME NOW, Plaintiffs, by and through counsel and pursuant to Fed. R. Civ. P. 15(a)(2),

and file this Second Amended Complaint in an adversary proceeding against the within named

Defendants and consenting to the entry of final orders or a judgment by this Court, as follows:

## PARTIES

1.    Plaintiff Jason Littrell is a citizen of Mississippi.

2.      Littco, LLC ("Littco") is a for-profit limited liability company organized and existing under the laws of Mississippi.

3.      Plaintiff William L. Fava is the duly appointed Chapter 7 bankruptcy trustee for Mississippi limited liability company Littco Metals, LLC ("Littco Metals").

4.      Defendant Tyler Burgess is a citizen of Illinois.

5.      Defendant Tonia Etoh is a citizen of Illinois.

6.      Defendant International Development Services, Inc. ("IDS") is a corporation organized and existing under the laws of Wyoming, with a principal place of business in Illinois. Mr. Burgess and Ms. Etoh are its owners and officers.

7.      Defendant International Services, Inc. ("ISI") is a corporation organized and existing under the laws of Illinois, with a principal place of business in Illinois. Mr. Burgess and Ms. Etoh are its owners and officers.

8.      Defendant TAVAS, LLC ("TAVAS") is a limited liability company organized and existing under the laws of Nevada, with a principal place of business in Illinois. Mr. Burgess and Ms. Etoh are its managing members.

9.      Penhurst Capital, Inc. ("Penhurst") is a corporation organized and existing under the laws of Nevada, with a principal place of business in Nevada. At all times relevant to this Second Amended Complaint, Ms. Etoh served as its director, president, secretary, and treasurer.

10.      Defendant Tim Willits is a citizen of a state other than Mississippi.

11.      Defendant Nathan Free is a citizen of Illinois.

12.      Defendant Jerold Weissberg is a citizen of a state other than Mississippi.

13.      Defendant Robert Legon is a citizen of a state other than Mississippi.

14.      Defendant Bruce Bush is a citizen of Arizona.

15.    Defendant Dale Johnston is a citizen of Illinois.

16.    Defendant James Peters is a citizen of Illinois.

17.    Defendant Byzfunder NY, LLC ("Byzfunder") is a limited liability company organized

and existing under the laws of New York, with a principal place of business in New York. It is

also known as Nano-Fi, Byzmicro, and Tandem Advance.

18.    Defendant NewCo Capital Group IV, LLC ("NewCo") is a limited liability company

organized and existing under the laws of Delaware, with a principal place of business in New

York. It is a sister corporation of NewCo Capital Group, LLC, NewCo Capital Group II, LLC,

and NewCo Capital Group III, LLC.

19.    Defendant Mehandi Vakil (aka Mehdi Vakil) is a citizen of California.

20.    Defendant Wise Venture, LLC, ("Wise") is a limited liability company organized and

existing under the laws of California, with a principal place of business in California. Mr. Vakil

is its managing member.

21.    Defendant Steven Markowitz, Jr. is a citizen of New York.

22.    Defendant Samson MCA, LLC ("Samson") is a limited liability company organized and

existing under the laws of Delaware, with a principal place of business in New York. It is also

known as AFG Funding, Venture Growth Capital, MW GRP Capital, and Fast Pitch Capital. Mr.

Markowitz, Jr. is its managing member.

23.    Defendant Cloudfund, LLC ("Cloudfund") is a limited liability company organized and

existing under the laws of New York, with a principal place of business in New York. It is also

known as Samson Group, Fundomania, MW Capital, Paramount Capital, Lynx Capital, and

Hybrid Capital Partners.

24.    Yaakov Winograd is a citizen of New York. He is also known as Jake Winograd.

25.     Defendant Unique Funding Solutions, LLC ("Unique") is a limited liability company organized and existing under the laws of New York with a principal place of business in New York. Mr. Winograd is its managing member.

26.     Defendant Prosperum Capital Partners, LLC ("Prosperum") is a limited liability company organized and existing under the laws of New York with a principal place of business in New York. It is also known as Arsenal Funding, Restart Capital, and Secure Business Servicing.

27.     John and Jane Doe Defendants 1-10 are liable for the claims alleged on grounds that they committed the complained of conduct or directed, authorized, or empowered other parties to do so; however, their true identities or roles are unknown at this time.

28.     Entity Doe Defendants 1-5 are liable for the claims alleged on grounds that they committed the complained of conduct or directed, authorized, or empowered other parties to do so; however, their true identities or roles are unknown at this time.

JURISDICTION & VENUE

29.     This Court has jurisdiction over this cause pursuant to 29 U.S.C. § 1334 and 11 U.S.C. § 541. This is a core proceeding within the meaning of 28 U.S.C. § 157.

30.     Federal subject-matter jurisdiction also exists pursuant to 18 U.S.C. §§ 1961, *et seq*. (Racketeer Influenced and Corrupt Organizations Act ("RICO")), 28 U.S.C. § 1331 (Federal Question), and 28 U.S.C. §§ 2201, *et seq*. (Declaratory Judgments).

31.     Supplemental jurisdiction over Plaintiffs' state law claims exists pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal claims.

32.     Venue is proper in this district and division pursuant to 28 U.S.C. §§ 1391(b) and 104(a)(1) as a substantial part of the acts or omissions giving rise to the claims occurred here, and because this is the Court in which Littco Metals' bankruptcy proceeding is pending.

FACTS

**The Business Consulting Swindle**

33.     Mr. Burgess and Ms. Etoh are siblings, owners and officers of IDS, owners and officers

of ISI, managing members of TAVAS, and orchestrators of a complex "business consulting"

scheme with a "debt trap" component. Although the debt trap has a more recent vintage, the

consulting swindle is essentially the same fraud their father John Burgess perpetrated for years

under the name International Profit Associates ("IPA").[1]

34.     The scheme is a long con. It begins by identifying a business in financial distress,

whether through an examination of Uniform Commercial Code ("UCC") filings or other means.

A cold call to the business leads to a cadre of IDS agents arriving in ones and twos to deliver a

layered sales pitch. The vulnerable condition of the target is confirmed by a quick audit of its

books. Management and consulting services are promised along with a money-back guarantee.

35.     When a target business and its owner decide to swing at the pitch, the scheme progresses.

TAVAS or another associated enterprise is brought in, purportedly to provide legal, accounting,

financial or other specialized advice, while ISI and IDS employees, associates, and loan brokers

work to engage predatory non-traditional lenders to provide usurious loans the business owner

must personally secure.

36.     The usurious loans are primarily used to pay the exorbitant fees and expenses IDS

charges and to service the loans themselves. As debt and financial distress increase, the business

owner is repeatedly told to trust the process and follow all advice given by IDS, ISI, TAVAS,

and other associated enterprises.

---

[1] *See, e.g., Amari Co., Inc. v. Burgess*, 955 F.Supp.2d 868 (N.D. Ill. 2013); Joseph
Rosenbloom, *I'm John Burgess. I'm Here to Help You.*, INC., June 1, 2000.

37.     Delays and disruptions these defendants cause to the target business ensure the "project" will exceed the number of hours anticipated by the initial engagement and, if all goes according to plan, lead to a series of fee-generating extensions or even an entirely new engagement.

38.     Once the target business and its owner are hopelessly in debt, IDS decides whether to take over and/or restructure the business into a new IDS-controlled company. If it decides to assume control over the business, steps are taken to transfer or liquidate assets to shield them from creditors and/or a prospective bankruptcy under the small business debtor reorganization provisions of 11 U.S.C. §§ 1181-1195 ("Chapter 11–Subchapter V"). When a takeover or restructuring is considered, IDS and ISI often bring in current or former employees and individuals employed by associated companies. Dale Johnston and Bruce Bush were involved in these types of engagements on November 17, 2022, and other dates to be identified in discovery.

39.     Mr. Burgess, Ms. Etoh, IDS, ISI, TAVAS, and their associated enterprises profit from the scheme by charging and collecting outrageous payments for services they promise but never provide, and by generating shadow revenue from undisclosed brokerage fees derived from the usurious loans they arrange.

**The Debt Trap**

40.     The predatory and usurious loans Mr. Burgess, Ms. Etoh, IDS, ISI, TAVAS, and their associated enterprises arrange are often described as Revenue Purchase Agreements, but this implies a buy/sell arrangement that does not actually exist. In truth, these transactions are Merchant Cash Advances ("MCAs").

41.     Unlike traditional small business loans, essential terms such as the repayment period, interest rate, and annual percentage rate ("APR") on an MCA are never fully disclosed, although they remain calculable. This lack of transparency arises from unconscionable contracts and

6

"factor rates," typically 1.1 to 1.5, that are added to the astronomical fees charged by the lender but not clearly identified in the terms of the agreement.[2]

42. MCAs are repaid weekly, or even daily, with automatic drafts that sweep the borrower's account for a fixed sum (or, if unavailable, a percentage of each deposit). As a result, they impact cash flow and trap borrowers in debt cycles—traditional lending becomes unattainable as debt service obligations increase, and MCA after MCA must be used to keep the business afloat.[3]

43. MCAs are fraudulently structured to look like commercial transactions. MCA lenders do this by claiming to pay a lump sum to purchase a percentage of future receivables at a discount in exchange for a fixed repayment obligation. MCA lenders structure their loans in this way to avoid direct federal regulation, subject only to the UCC of each state. As a result, MCAs provide fertile ground for predatory companies, including the defendant MCA lenders.

44. Mr. Vakil, Mr. Markowitz, Jr., Mr. Winograd, Byzfunder, NewCo, Wise, Samson, Cloudfund, Unique, and Prosperum all attempt to circumvent usury laws through unconscionable contract provisions that require borrowers to declare loans are purchases and waive substantive legal rights, such as trial by jury, choice of law, and forum selection.

45. Mr. Burgess, Ms. Etoh, Mr. Peters, IDS, ISI, and TAVAS are acutely aware of these facts including, the danger, confusion, and expense associated with MCAs. Indeed, this is why they encourage serial MCAs—not because they are in the best interest of a target business, but

---

[2] A "factor rate" is a fixed amount expressed as a decimal. A factor rate is multiplied by a loan amount to calculate a payback amount. If $50,000 is offered at a factor rate of 1.4, the owed amount is $70,000, meaning the base cost of financing is $20,000. When $20,000 is divided by $50,000, the result is the percentage cost of the loan. In this example, the percentage cost is 0.4 which, multiplied by 365, equals 146. Assuming a six-month (182-day) repayment period, the interest rate is 80.2% (before consideration of the fees needed to calculate APR).

[3] The National Consumer Law Center and other interested non-profits have concluded the entire MCA "business model is based on a long-term debt trap." https://www.nclc.org/wp-content/uploads/2023/01/comments-fintech-jan2017.pdf at p. 23.

because they severely impact cash flow, result in impossible debt cycles, and generate
undisclosed broker fees.

46.    Mr. Vakil, Mr. Markowitz, Mr. Winograd, Byzfunder, NewCo, Wise, Samson,
Cloudfund, Unique, and Prosperum are MCA lenders that routinely conspire with Mr. Burgess,
Ms. Etoh, Mr. Peters, IDS, ISI, TAVAS, and their associated loan brokers, individuals,
companies, and enterprises in violation of 18 U.S.C. § 1962(d), for the purpose of conducting
racketeering activity and collecting unlawful debts in violation of Section 1962(a), (b), and (c).

47.    Mr. Burgess, Ms. Etoh, Mr. Peters, IDS, ISI, TAVAS, and their associated enterprises
serve as brokers, facilitating transactions with MCA lenders in exchange for commissions. They
do not disclose this conflict of interest. They lead financially vulnerable business owners,
including Mr. Littrell, to believe they are acting as unbiased agents of the target business.

48.    Mr. Littrell, Littco, and Littco Metals are no longer in operation as a result of the conduct
of the defendants as set forth herein, and Mr. Littrell and Littco Metals were required to file for
bankruptcy protection as a result of the acts alleged herein. The bankruptcy proceeding filed by
Littco Metals is still pending in this Court.

### The Target Business

49.    Jason Littrell is a general contractor by trade who saw an opportunity in the metal
buildings industry. On October 4, 2019, Mr. Littrell formed a company, Littco, to pour concrete
slabs and erect metal buildings. The following year, on July 1, 2020, he formed Littco Metals to
design and fabricate metal structures ranging from pole barns to gas station canopies.

50.    Although the corporate existence of Littco, continued, and its name continued to be used
by Mr. Littrell in some contexts (and was used by Samson and Byzfunder in the proofs of claim
they each filed in this case), Littco Metals took its place as his principal business endeavor.

51.    As Littco Metals grew, Mr. Littrell added to his payroll, leased a larger workspace, and made capital investments in equipment to service a reliable base of repeat commercial clients. The only recurrent problem Mr. Littrell faced in 2021 and before was proper cash flow management—an issue that was never far from his mind.

52.    In late-October 2021, Mr. Littrell received a cold call from IDS representative Tim Willits who gave him a well-rehearsed sales pitch that outlined the sorts of business management and consulting services IDS was allegedly prepared to provide.

53.    When Mr. Littrell did not hang up immediately, Mr. Willits seized the opportunity to secure an in-person meeting. He arrived at Mr. Littrell's West Point office the following morning and continued to tout the many services IDS could purportedly provide.

54.    Mr. Willits presented himself in an earnest, trustworthy, and professional manner, and Mr. Littrell showed interest. The next morning a second IDS representative by the name of "Terry" flew in from Chicago to speak further with Mr. Littrell.

55.    Like Mr. Willits, Terry claimed IDS could improve the business operations of Littco and Littco Metals. After a quick review of the books, Terry claimed Mr. Littrell was "running a ten-million-dollar company that was acting like a one-million-dollar company." Terry said the next step would be to have two more IDS representatives visit Mr. Littrell.

56.    The very next day, IDS representatives Nathan Free and Jerold Weissberg flew in from Chicago to offer Mr. Littrell an ironclad assurance: If he retained IDS and followed its advice, he would make twice the amount IDS charged for its services or receive a full refund.[4]

57.    On November 1, 2021, only a few days after the initial cold call, a service agreement (the "Initial Engagement") was presented to Mr. Littrell for his execution.

---

[4] A similar ploy was used by John Burgess more than two decades ago when his employees were trained to tell potential marks: "No recommendation will be made for consulting services unless I am able to substantiate a three-to-one return for every dollar invested." Rosenbloom, *supra*.

58.     According to the Initial Engagement, the estimated fee for the business management and consulting services IDS promised to provide Mr. Littrell, Littco and Littco Metals was $222,750 (+/- 10%), plus expenses, in addition to a "first day accrual" of $9,900.

59.     The fees were for 450 hours of work (+/- 10%) at a rate of $495/hour for an IDS "Senior Project Manager" and $495/hour for an IDS "Senior Business Consultant." The expenses were to include airfare, ground transportation and lodging, plus taxes, as well as two $62 per diems.

60.     Pursuant to the Initial Engagement, the project was to commence the very next morning, on November 2, 2021, at 8:00 a.m., and continue until completed.

61.     The Initial Engagement includes the following relevant provisions:

   a)   "IDS does not directly, or indirectly, provide bonding, financing, investment banking or securities related services to its clients";

   b)   "[N]o IDS representative is permitted to make any representations regarding the rendering of such services by IDS for IDS clients"; and

   c)   "[N]o IDS representative is authorized to promise that financing can, or will, be obtained from any source for any purpose (including the funding of this engagement)."

62.     When the Initial Engagement was presented to Mr. Littrell, IDS already knew the financial situation of Littco and Littco Metals was such that these companies could not pay nearly a quarter of a million dollars in business management and consulting fees.

63.     As a result, and solely for its own benefit, IDS represented that Mr. Littrell and his businesses would never qualify for financing from a traditional lender then began taking steps to secure the payment of their fees by means of an MCA.

64.     In other words, IDS immediately did what it contracted not to—it promised to secure
financing for "the funding of this engagement"—then went to work with TAVAS to prequalify
Mr. Littrell and his businesses for the first of what would become a series of usurious loans. Mr.
Peters individually and on behalf of IDS and ISI participated in and profited as a loan broker or
facilitator related to this series of usurious loans.

65.     On November 3, 2021, IDS and TAVAS arranged for Littco and Littco Metals to enter
into a "Revenue Purchase Agreement" with Byzfunder, secured by a personal guaranty from Mr.
Littrell. The agreement was an MCA, as described *supra*. The stated purpose of this MCA was to
pay the fees and expenses contemplated by the Initial Engagement.

66.     Byzfunder offered $350,000 at a factor rate of 1.34, resulting in an owed amount of
$469,000 at a base financing cost of $119,000. It added an "administrative fee" of $10,500 and a
"processing fee" of $175. Thus, the total financing cost was $129,675, and the net funding
amount was $339,325.

67.     In exchange, Byzfunder took automatic weekly payments of $13,027.78 (or 8% of each
deposit) from the operating account of Littco Metals. Assuming a full payment each week, this
means Byzfunder contemplated a 36-week (252-day) repayment period.

68.     When the total financing cost of this MCA is divided by the offered amount, the
percentage cost of the loan is revealed to be 0.3705 which, multiplied by 365, is 135.2.
Assuming full repayment in 252 days results in an APR of 53.65%.

69.     In early December 2021, after using the Byzfunder MCA to significantly increase the
debt and weekly debt servicing obligations of Littco and Littco Metals, IDS told Mr. Littrell his
businesses were in desperate need of operating cash and that an additional MCA was required to
keep the business afloat.

70.    On December 17, 2021, facing an inability to make his next payroll, Mr. Littrell entered into a "Revenue Purchase Agreement" with NewCo. As with the Byzfunder MCA discussed *supra*, this MCA was secured by a personal guaranty from Mr. Littrell.

71.    NewCo offered $50,000 at a factor rate of 1.34, resulting in an owed amount of $67,000 at a base financing cost of $17,000. It added an "underwriting fee" of $750 and an "origination fee" of $750. Thus, the total financing cost was $18,500, and the net funding amount was $48,500.

72.    In exchange, NewCo took automatic weekly payments of $2,393 (or 15% of each deposit) from the operating account of Littco Metals. Assuming a full payment each week, this means NewCo contemplated a 28-week (196-day) repayment period.

73.    When the total financing cost of this MCA is divided by the offered amount, the percentage cost of the loan is revealed to be 0.37 which, multiplied by 365, is 135.05. Assuming full repayment in 196 days results in an APR of 68.9%.

74.    Among other things, the Initial Engagement obligated IDS to provide Mr. Littrell and his businesses with accurate, reliable, and up-to-date Value Enhancement Reports ("VERs") and Cash Management Reports ("CMRs"). IDS and TAVAS told Mr. Littrell to make decisions based on these reports and that they would guide him to success.

75.    The VERs generated by IDS were completely worthless.

76.    The CMRs generated by TAVAS, most often by TAVAS employee Robert Legon, were inaccurate, unreliable, and failed to contain current information.

77.    Among other things, Mr. Legon was charged with evaluating the QuickBooks system utilized by Littco and Littco Metals, and determining whether it should be updated or modified.

78.     In what appeared inexplicable at the time, but now appears intentional, negligent, or grossly negligent, Mr. Legon's QuickBooks review dragged on for months. This was significant because QuickBooks was supposed to feed information into the CMRs.

79.     Employees of Littco and Littco Metals regularly complained about the quality of the CMRs. IDS and TAVAS maintained that these complaints were unfounded and directed Mr. Legon to update the CMRs "manually" until his QuickBooks review was complete.

80.     On January 12, 2022, Mr. Weissberg told Mr. Littrell an immediate and substantial cash infusion was needed to keep Littco and Littco Metals afloat, but expressed doubt regarding his ability to entice any new lenders. Mr. Weissberg indicated capital investments in machinery would make the financing request more attractive.

81.     As a result, on January 28, 2022, Mr. Littrell approved invoices for two large equipment purchases from Superior Machinery in Burt, Michigan. The purchases totaled $258,500. The first item of equipment was an "uncoiler, straightener, 80 ton press" that cost $99,000, and the second was a "folding machine" that cost $159,500.

82.     By January 31, 2022, Mr. Weissberg had already completed an updated equipment and materials inventory, and by February 8, 2022, he had already sent it with financing proposals to at least two potential lenders. The plan worked.

83.     On February 16, 2022, IDS and TAVAS arranged for Littco and Littco Metals to enter into a "Standard Merchant Cash Advance Agreement" with Wise secured by a personal guaranty from Mr. Littrell. The agreement was an MCA, as described *supra*. The stated purpose of this MCA was to generate working capital and improve cash flow.

84.    Wise offered $350,000 at a factor rate of 1.37, resulting in an owed amount of $479,500 at a base financing cost of $129,500. It added an "underwriting fee" of $10,500 and a "UCC fee" of $195. Thus, the total financing cost was $140,195, and the net funding amount was $339,155.

85.    In exchange, Wise took automatic weekly payments of $17,125 (or 6% of each deposit) from the operating account of Littco Metals. Assuming a full payment each week, this means Wise contemplated a 28-week (196-day) repayment period.

86.    When the total financing cost of this MCA is divided by the offered amount, the percentage cost of the loan is revealed to be 0.40 which, multiplied by 365, is 146. Assuming full repayment in 196 days results in an APR of 74.5%.

87.    Although Mr. Weissberg told Mr. Littrell that proceeds from the Wise MCA would be used to generate working capital and improve cash flow, IDS secretly intended to convert the proceeds to fund a future extension of the Initial Engagement.

88.    On February 17, 2022, two new corporations, Littco Metals Leasing and Littco Metals Management, were registered with the Mississippi Secretary of State at the insistence of IDS and TAVAS, and with the assistance of Illinois attorney and TAVAS employee, Chris Ryan.

89.    When registering these corporations with the Secretary of State, Mr. Ryan reported his address was 3850 N. Wilke Rd., Arlington Heights, Illinois. This address is associated with ISI, TAVAS and SMS-NA, LLC, yet another entity controlled by Mr. Burgess and Ms. Etoh.

90.    In February 2022, IDS convinced Mr. Littrell to extend the Initial Engagement for an additional month then took a $100,000 retainer from the proceeds of the Wise MCA.

91.    In March 2022, IDS convinced Mr. Littrell to extend the Initial Engagement for a second month then took another $100,000 retainer from the proceeds of the Wise MCA.

92.     In April 2022, IDS convinced Mr. Littrell to extend the Initial Engagement for a third

month. To pay the retainer associated with this extension, IDS and TAVAS arranged a second

"Standard Merchant Cash Advance Agreement" with Wise, secured by another personal

guaranty from Mr. Littrell. The agreement was an MCA, as described *supra*.

93.     On April 25, 2022, Wise offered $315,000 at a factor rate of 1.35, resulting in an owed

amount of $425,250 at a base financing cost of $110,250. It added an "underwriting fee" of

$12,600 and a "UCC fee" of $195. Thus, the total financing cost was $123,045, and the net

funding amount was $302,205.

94.     In exchange, Wise took automatic weekly payments of $15,750 (or 7% of each deposit)

from the operating account of Littco Metals. Assuming a full payment each week, this means

Wise contemplated a 27-week (189-day) repayment period.

95.     When the total financing cost of this MCA is divided by the offered amount, the

percentage cost is revealed to be 0.3906 which, multiplied by 365, is 142.56. Assuming full

repayment in 189 days results in an APR of 75.43%.

96.     On April 29, 2022, IDS and TAVAS arranged an "equipment lease" between Littco

Metals and NSF Leasing ("NSF").

97.     As part of the NSF lease, the $156,500 balance still owed on the Byzfunder MCA and the

$23,962 balance still owed on the NewCo MCA were each refinanced and paid off.

98.     Littco and Littco Metals received no discount for early repayment. Byzfunder received

the full $469,000 associated with its MCA in 177 days, resulting in an effective APR of 76.4%,

and NewCo received the full $67,000 associated with its MCA in 133 days, resulting in an

effective APR of 101.5%.

99.      In May 2022, IDS convinced Mr. Littrell to extend the Initial Engagement for a fourth

month. To pay the retainer associated with this extension, IDS and TAVAS arranged a third

"Standard Merchant Cash Advance Agreement" with Wise, secured by another personal

guaranty from Mr. Littrell. The agreement was an MCA, as described *supra*.

100.     On May 3, 2022, Wise offered $500,000 at a factor rate of 1.37, resulting in an owed

amount of $685,000 at a base financing cost of $185,000. It added an "underwriting fee" of

$15,000 and a "UCC fee" of $195. Thus, the total financing cost was $200,195, and the net

funding amount was $484,805.

101.     In exchange, Wise took automatic daily payments of $4,281.25 (or 14% of each deposit)

from the operating account of Littco Metals. Assuming a full payment each day, this means Wise

contemplated a 160-day repayment period.

102.     When the total financing cost of this MCA is divided by the offered amount, the

percentage cost of the loan is revealed to be 0.400 which, multiplied by 365, is 146. Assuming

full repayment in 160 days results in an APR of 91.25%.

103.     As part of the third Wise MCA, the $308,250 balance owed on the first Wise MCA was

refinanced and paid off, leaving a new net funding amount of only $176,555.

104.     Littco and Littco Metals received no discount for early repayment of the first Wise MCA.

Wise received the full $479,500 associated with that MCA in only 76 days, resulting in an

effective APR of 192.1%.

105.     On June 9, 2022, IDS and TAVAS arranged a "Revenue Purchase Agreement" with

Samson, secured by another personal guaranty from Mr. Littrell. The agreement was an MCA, as

described *supra*. The stated purpose of this MCA was to pay off all three Wise MCAs and to

continue paying IDS.

106.    Samson offered $1,300,000 at a factor rate of 1.39, resulting in an owed amount of $1,807,000 at a base financing cost of $507,000. It added an "underwriting fee" of $19,500, an "origination fee" of $19,500, and a "processing fee" of $75. Thus, the total financing cost was $546,075, and the net funding amount was $753,925.

107.    In exchange, Samson took automatic weekly withdrawals of $31,999 (or 25% of each deposit) from the operating account of Littco Metals. Assuming a full payment each week, this means Samson contemplated approximately a 56.5-week (395-day) repayment period.

108.    When the total financing cost of this MCA is divided by the offered amount, the percentage cost of the loan is revealed to be 0.42 which, multiplied by 365, is 153.3. Assuming full repayment in 395 days results in an APR of 38.88%.

109.    As part of the Samson MCA, the $908,718.75 owed to Wise on its two outstanding MCAs was refinanced and paid off, leaving a new net funding amount of only $352,206.25.

110.    Littco and Littco Metals received no discount for early repayment of the two outstanding Wise MCAs. Wise received the full $425,250 associated with its second MCA in only 45 days, resulting in an effective APR of 316.8%, and it received the full $685,000 associated with its third MCA in only 37 days, resulting in an effective APR of 394.59%.

111.    On July 25, 2022, IDS and TAVAS negotiated and arranged another "Revenue Purchase Agreement" with Byzfunder, secured by another personal guaranty from Mr. Littrell. The agreement was an MCA, as described *supra*.

112.    Byzfunder offered $250,000 at a factor rate of 1.34, resulting in an owed amount of $335,000 at a base financing cost of $85,000. It added an "administrative fee" of $7,500 and a "processing fee" of $175. Thus, the total financing cost was $92,675, and the net funding amount was $242,325.

113.    In exchange, Byzfunder took automatic weekly withdrawals of $8,815.79 (or 3% of each

deposit) from the operating account of Littco Metals. Assuming a full payment each week, this

means Byzfunder contemplated approximately a 38-week (266-day) repayment period.

114.    When the total financing cost of this MCA is divided by the offered amount, the

percentage cost of the loan is revealed to be 0.37 which, multiplied by 365, is 135.3. Assuming

full repayment in 266 days results in an APR of 35.99%.

115.    On September 9, 2022, IDS and TAVAS negotiated and arranged a "Future Receipts Sale

and Purchase Agreement" with Cloudfund, secured by another personal guaranty from Mr.

Littrell. The agreement was an MCA, as described *supra*.

116.    Cloudfund offered $150,000 at a factor rate of 1.38, resulting in an owed amount of

$207,000 at a base financing cost of $57,000. It added an "origination fee" of $4,500. Thus, the

total financing cost was $61,500, and the net funding amount was $145,500.

117.    In exchange, Cloudfund took automatic weekly withdrawals of $7,667 (or 3% of each

deposit) from the operating account of Littco Metals. Assuming a full payment each week, this

means Cloudfund contemplated approximately a 27-week (189-day) repayment period.

118.    When the total financing cost of this MCA is divided by the offered amount, the

percentage cost of the loan is revealed to be 0.41 which, multiplied by 365, is 149.65. Assuming

full repayment in 189 days results in an APR of 28.28%.

119.    On October 3, 2022, in the face of growing debt repayment obligations and a worsening

financial situation, Mr. Littrell entered into a "Future Receivables Sale and Purchase Agreement"

with Prosperum. As with each of the MCAs discussed *supra*, this MCA was secured by a

personal guaranty from Mr. Littrell.

120.    Prosperum offered $200,000 at a factor rate of 1.45, resulting in an owed amount of $290,000 at a base financing cost of $90,000. It added an "origination fee" of $10,000, a "third party intermediary/debt restructuring fee" of $7,500, and a "UCC fee" of $195. Thus, the total financing cost was $107,695, and the net funding amount was $182,305.

121.    In exchange, Prosperum took automatic weekly withdrawals of $14,500 (or 6% of each deposit) from the operating account of Littco Metals. Assuming a full payment each week, this means Prosperum contemplated a 20-week (140-day) repayment period.

122.    When the total financing cost of this MCA is divided by the offered amount, the percentage cost of the loan is revealed to be 0.54 which, multiplied by 365, is 197.1. Assuming full repayment in 140 days results in an APR of 27.59%.

123.    Additionally, on October 3, 2022, Mr. Littrell entered into a "Standard Merchant Cash Advance Agreement" with Unique, secured by another personal guaranty.

124.    Unique offered $200,000 at a factor rate of 1.46, resulting in an owed amount of $292,000 at a base financing cost of $92,000. It added an "origination fee" of $10,000. Thus, the total financing cost was $102,000, and the net funding amount was $190,000.

125.    In exchange, Unique took automatic weekly withdrawals of $14,600 (or 5% of each deposit) from the operating account of Littco Metals. Assuming a full payment each week, this means Unique contemplated a 20-week (140-day) repayment period.

126.    When the total financing cost of this MCA is divided by the offered amount, the percentage cost of the loan is revealed to be 0.51 which, multiplied by 365, is 186.15. Assuming full repayment in 140 days results in an APR of 26.06%.

127.    Mr. Littrell's efforts were not enough to pull his businesses out of the tailspin caused by the actions of Mr. Burgess, Ms. Etoh, IDS, ISI, TAVAS, and their associated enterprises.

128.    On November 14, 2022, IDS arranged for Mr. Littrell and his wife to fly to Chicago to

visit the IDS home office where they met with Mr. Burgess and Ms. Etoh. Mr. Burgess and Ms.

Etoh made personal guarantees and promises to Mr. Littrell, and assured him that capable and

professional hands were guiding his business interests.

129.    On November 17, 2022, with Mr. Littrell and his businesses hopelessly in debt, IDS

reminded Mr. Littrell that the ironclad assurance of profitability he received at the outset only

applied if he followed the advice he received from IDS, then convinced him to execute a series

of documents while he was under extreme financial duress.

130.    Documents executed under duress by Mr. Littrell on that date include, (a) the Minutes of

a Joint Meeting of the Members of Littco Metals, LLC and the Board of Directors of Littco

Metals Management Co. Littco Metals Equipment Leasing, Inc., (b) the Minutes of a Joint

Annual Meeting of the Board of Directors of the Members of Littco Metals, LLC and the Boards

of Directors of Littco Metals Management Co. and Littco Metals Equipment Leasing, Inc., (c) a

Personal Guarantee in favor of Penhurst, (d) a Security Agreement in favor of ISI, (e) a Stock

Pledge Agreement in favor of IDS, (f) a second Service Agreement with IDS, and (g) a

Promissory Note in favor of ISI.

131.    The Minutes of a Joint Annual Meeting of the Board of Directors of the Members of

Littco Metals, LLC and the Boards of Directors of Littco Metals Management Co. and Littco

Metals Equipment Leasing, Inc. states, among other things, Mr. Littrell "is authorized to borrow

$1,038,915.29 from Penhurst Capital, Inc. at an annual interest rate of fifteen percent (15%) to be

repaid in twenty-four (24) months," "pledges his shareholder interest in Littco Metals, LLC, to

secure the aforementioned loan," and "that Bruce Bush is appointed interim president of Littco

Metals, LLC with full authority to control and manage all financial accounts and operations."

132.    The second Service Agreement with IDS includes an Exhibit A titled "Description of

Services," which states: "Management consulting services to include, but not limited to,

complete operational and financial control of LITTCO and LITTCO METAL EQUIPMENT

LEASING, INC."

133.    Unbeknownst to Mr. Littrell, Penhurst appears to be little more than a shell corporation

(the address listed for Penhurst on the Personal Guarantee signed by Mr. Littrell is for InCorp

Services, Inc., a registered agent), and Ms. Etoh was its director, president, treasurer, and

secretary from at least October 22, 2020, until February 22, 2022.

134.    Although ISI and Penhurst produced a document allegedly generated by Bank of

Montreal (Canada) reflecting the "Wire Details" of a $1,038,915.29 transfer from ISI/Penhurst to

Littco Metals, Mr. Littrell and his businesses never received these funds.

135.    Leading up to November 17, 2022, Mr. Burgess, Ms. Etoh, IDS, ISI, TAVAS and their

associated entities, including Penhurst, conspired to take over Littco and Littco Metals, place the

assets of these companies under their control, and leave Mr. Littrell personally responsible for all

the debts they caused him and his businesses to incur over the prior year.

136.    On January 4, 2023, Mr. Littrell and his businesses received a "Notice to Cure Default"

under the November 17, 2022, "Promissory Note" from Littco Metals to ISI.

137.    On January 10, 2023, Mr. Littrell and Littco Metals filed for bankruptcy protection in this

Court. The Notice of Bankruptcy Case Filing made on behalf of Littco Metals identifies its "dba"

as Littco, Littco Metals Management, and Littco Metals Leasing.

138.    The Chapter 11 bankruptcy action filed by Mr. Littrell has been voluntarily dismissed.

What began as a Chapter 11, subpart 5, bankruptcy for Littco Metals has been converted to a

Chapter 7, and is currently pending.

## RICO CASE STATEMENT

139.    Subsection (a) and (b) of 18 U.S.C. § 1962 forbids income derived from "a pattern of

racketeering activity or through collection of an unlawful debt" from being invested in or used to

obtain an interest in or control over an enterprise engaged in interstate commerce; subsection (c)

forbids any person who derives income from such prohibited activities from conducting the

affairs of an enterprise engaged in interstate commerce; and subsection (d) forbids conspiracies

to violate subsections (a), (b), or (c). Defendants have violated each of these provisions many

times and continue to do so.

140.    18 U.S.C. § 1961(6) defines "unlawful debt" to include "a debt (A) … which is

unenforceable under State or Federal law in whole or in part as to principal or interest because of

laws relating to usury, and (B) which was incurred in connection with … the business of lending

money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is

at least twice the enforceable rate."

141.    18 U.S.C. § 1961(a) defines "racketeering activity" to include, among other frauds and

swindles, mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343. The

predicates for these frauds are set forth in their respective sections, which each require a culpable

person who, "having devised or intended to devise any scheme or artifice to defraud, or for

obtaining money or property by means of false or fraudulent pretenses, representations, or

promises," utilizes the Postal Service, any private or commercial interstate carrier, or a wire, for

the purpose of executing or attempting to execute such scheme or artifice.

142.    18 U.S.C. § 1346 defines "scheme or artifice to defraud," as used in the RICO context, to

include "a scheme or artifice to deprive another of the intangible right of honest services." Mail

or wire fraud may also be premised on non-disclosure where a duty of disclosure exists.

143.    Littco, Littco Metals, IDS, ISI, TAVAS, Penhurst, Byzfunder, NewCo, Wise, Samson,

Cloudfund, Unique, and Prosperum are enterprises engaged in interstate commerce, or activities

that affect interstate commerce, within the meaning of 18 U.S.C. § 1962.

144.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr.

Johnston, Mr. Peters, Mr. Vakil, Mr. Markowitz, and Mr. Winograd are culpable persons with

the requisite *mens rea* who invested income derived from a pattern of racketeering activity or

through collection of an unlawful debt in their respective enterprises; acquired an interest in or

control over their respective enterprises through a pattern of racketeering activity or through

collection of an unlawful debt; conduct the affairs of their respective enterprises through a

pattern of racketeering activity or collection of an unlawful debt, and conspired together to

violate the provisions of 18 U.S.C. § 1962.

CAUSES OF ACTION

**Count One: Declaratory Judgment**

145.    Plaintiffs adopt and incorporate all prior allegations by reference.

146.    There exists a substantial, immediate, and real controversy regarding the factual and legal

classification of the "Revenue Purchase Agreements" described above. The Trustee and other

plaintiffs have adverse legal interests to the defendants. The agreements at issue have caused and

will continue to cause substantial injury to the bankruptcy estate and the other plaintiffs.

147.    Plaintiffs and the bankruptcy trustee, in particular, are in need of a declaration of the

classification of each transaction at issue, and especially the transactions involving Byzfunder

and Samson in order to properly address the proofs of claim filed by these two MCA lenders.

148.    If these two transactions (and each MCA transaction at issue) are true sales then these

Defendants acquired ownership of the debtor's future receivables. If they are actually loans then

the lenders obtained no more than a security interest in the debtor's future receivables, which is

junior to other interests. Resolution of this question will also permit the Court to address whether

the transfers at issue were preferences. In the event that the debtor must rely on its receivables to

fund its operations, and if the Court finds the transactions at issue are "true sales," then the

debtor's accounts would be excepted from the property of the estate under § 541 of the

Bankruptcy Code, the debtor would lose this source of funding and, in turn, have to offer

adequate-protection payments under § 361 while seeking alternative funding under § 364, and

the § 362 automatic stay would not prohibit these Defendants from pursuing collection efforts. If

the Court finds these transactions are "disguised loans," then the Defendants could face losing

their collateral altogether, or at the very least see their claims potentially bifurcated under § 506,

and may face having their claims disallowed in their entirety under § 502(b)(1) on the grounds

that they are unenforceable, should the transactions be found to violate applicable usury laws.

149.   Plaintiffs ask the Court to declare that each "Revenue Purchase Agreement" identified

herein is an MCA in disguise.

150.   Plaintiffs further ask the Court to declare that these MCAs are unconscionable because

they contain:

   a) Predatory lending terms and conditions;

   b) An irrevocable right to automatic withdrawals;

   c) A prohibition against any unapproved transfer of the borrower business or its assets;

   d) A one-sided attorney fee provision favoring the lender;

   e) A venue and choice of law provision for an unrelated foreign jurisdiction;

   f) A personal guarantee from the business owner that, if revoked, constitutes a default;

   g) Jury trial and class action waivers;

h) An arbitration requirement;

i) A provision permitting a UCC lien on all business assets;

j) A prohibition against obtaining other sources of financing;

k) False representations including, that the transaction is not a loan and the fixed-rate payment amount represents a good faith estimate of future receivables;

l) A provision allowing for a default if the borrower business suffers a downturn;

m) A provision requiring the business owner to confess a judgment in favor of the lender;

n) A provision permitting acceleration of the entire debt in the event of default;

o) A provision deeming the loan a business premises lease in the event of default; and

p) A one-sided assignment provision favoring the lender.

### Count Two: Usury Violations

151.    Plaintiffs adopt and incorporate all prior allegations by reference.

152.    The MCA loans described herein are illegal and usurious under the civil laws of Mississippi, specifically, Miss. Code §§ 75-17-1, *et seq.*

153.    Alternatively, the MCA loans described herein are illegal and usurious under the criminal laws of New York, specifically, N.Y. Penal Law § 190.40.

154.    In each instance where the charged interest rate exceeds the amount allowed by law, Plaintiffs demand a minimum recovery of all interest payments and associated finance charges.

155.    In each instance where the charged interest rate exceeds 100%, Plaintiffs demand a minimum recovery of the principal, all interest payments and associated finance charges.

156.    All Defendants herein are liable for violation of applicable usury laws directly through their facilitation of the transaction at issue, or through their employment by the contracting entities.

157.    All Defendants are also liable for violation of applicable usury laws by virtue of their

participation in a RICO enterprise, civil conspiracy to commit fraud, principles of respondeat

superior, and through other acts to be shown in discovery and at trial.

## Count Three: RICO Violations

158.    Plaintiffs adopt and incorporate all prior allegations by reference.

159.    The actions of Defendants constitute racketeering activity as defined by 18 U.S.C.

1961(1), including the aiding and abetting of racketeering activity. Further, principles of

respondeat superior make all Defendants liable for the acts of other Defendants in the event there

was no direct participation in the racketeering activity by that Defendant.

160.    The racketeering activates of Defendants, include but are not limited to, extortionate

credit transactions, mail fraud, wire fraud, financial institution fraud, unlawful debt collection,

usury and other state-law prohibited predicate acts.

161.    Mr. Willits, Mr. Free, and Mr. Weissburg, IDS, ISI, and TAVAS violated Section

1962(a) in late-October and early-November, 2021 when they fraudulently induced Plaintiffs

into contracting for the non-existent and ultimately fraudulent services of IDS, ISI, and TAVAS.

Funds associated with the payments IDS received for these services were transferred by wire.

Relevant communications were made by wire, mail and/or email.

162.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr.

Johnston, Mr. Peters, IDS, ISI, and TAVAS violated Section 1962(a) beginning in late-October,

2021 and continuing repeatedly throughout 2022, they facilitated and procured, pursuant to

undisclosed and fraudulent "brokerage" or kick-back agreements, all of the MCA transactions

involving the plaintiffs in this case. The specific transactions are identified above and

incorporated herein. Funds associated with these transactions were transferred by wire. Relevant communications were sent by wire, mail and/or email.

163.    Mr. Burgess, Ms. Etoh, Mr. Legon IDS, ISI, and TAVAS violated Section 1962(a) beginning in late-October, 2021 when they provided inaccurate, unreliable, and ultimately fraudulent VERs and CMRs. Funds associated with the payments IDS received for this activity were transferred by wire. Relevant communications were sent by wire, mail and/or email.

164.    Mr. Burgess, Ms. Etoh, Mr. Weissburg, IDS, ISI, and TAVAS violated Section 1962(a) in January, 2022, when they induced and procured, pursuant to undisclosed and fraudulent "brokerage" or kick-back agreements, Plaintiffs to enter into equipment leases which were unnecessary and designed to defraud Plaintiffs. Funds associated with this transaction were transferred by wire. Relevant communications were sent by wire, mail and/or email.

165.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters IDS, ISI, and TAVAS violated Section 1962(a) on April 29, 2022, when they negotiated and arranged to pay off and refinance the Byzfunder and NewCo MCAs by rolling them into the NSF equipment lease. Funds associated with this transaction were transferred by wire. Relevant communications were sent by wire, mail and/or email.

166.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters IDS, ISI, TAVAS, and Byzfunder violated Section 1962(a) on November 3, 2021, when they induced Plaintiffs to enter into an MCA. Funds associated with this transaction were transferred by wire. Relevant communications were sent by wire, mail and/or email.

167.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters IDS, ISI, TAVAS, Newco and Mr. Vakil violated Section 1962(a) on December 17, 2021, when they induced Plaintiffs to enter into an MCA. Funds associated with

this transaction were transferred by wire. Relevant communications were sent by wire, mail and/or email.

168.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters, IDS, ISI, TAVAS, Wise and Mr. Markowitz violated Section 1962(a) on February 16, 2022 and again on April 25, 2022, when they induced Plaintiffs to enter into an MCA. Funds associated with this transaction were transferred by wire. Relevant communications were sent by wire, mail and/or email.

169.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters, IDS, ISI, TAVAS, Wise and Mr. Markowitz violated Section 1962(a) on May 3, 2022, when they negotiated and arranged to pay off and refinance the first two Wise MCAs. Funds associated with this transaction were transferred by wire. Relevant communications were sent by mail and/or email.

170.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters, IDS, ISI, TAVAS, and Samson violated Section 1962(a) on June 9, 2022, when they negotiated and arranged to pay off and refinance the NSF equipment lease and the consolidated Wise MCA loans. Funds associated with this transaction were transferred by wire. Relevant communications were sent by mail and/or email.

171.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters IDS, ISI, TAVAS, and Byzfunder violated Section 1962(a) on July 25, 2022, when they induced Plaintiffs to enter into an MCA. Funds associated with this transaction were transferred by wire. Relevant communications were sent by wire, mail and/or email.

172.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters, IDS, ISI, TAVAS, and Cloudfund violated Section 1962(a) on September

9, 2022, when they induced Plaintiffs to enter into an MCA. Funds associated with this transaction were transferred by wire. Relevant communications were sent by wire, mail and/or email.

173.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters, IDS, ISI, TAVAS, and Prosperum violated Section 1962(a) on October 2, 20221, when they induced Plaintiffs to enter into an MCA. Funds associated with this transaction were transferred by wire. Relevant communications were sent by wire, mail and/or email.

174.    Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters, IDS, ISI, TAVAS, Unique and Mr. Winograd violated Section 1962(a) on November 3, 2021, when they induced Plaintiffs to enter into an MCA. Funds associated with this transaction were transferred by wire. Relevant communications were sent by wire, mail and/or email.

175.    18 U.S.C. § 1962(b) prohibits persons and entities from participating in a pattern of racketeering or unlawful debt collection activity to acquire an interest in or maintain control of a business engaged in interstate commerce. Mr. Burgess, Ms. Etoh, Mr. Peters, Mr. Johnston, Mr. Bush, IDS, ISI, and TAVAS violated Section 1962(b) leading up to and November 17, 2022, when Littco Metals Management and Littco Metals Leasing were formed and placed under IDS control, and funds from usurious MCA loans were invested in these entities. The participation in racketeering continued after the formation of these entities.

176.    18 U.S.C. § 1962(c) prohibits a person employed by or associated with a business engaged in interstate commerce from participating in a pattern of racketeering or unlawful debt collection activity. Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, and Mr. Peters are persons employed by or associated with IDS, ISI,

and TAVAS, who violated Section 1962(c) by attempting to collect a usurious debt on January 4,

2023. Funds associated with this debt were transferred by wire. Relevant communications were

sent by wire, mail and/or email.

177.    18 U.S.C. § 1962(d) prohibits two or more persons from conspiring to violate subsections

(a), (b), and (c) of Section 1962. Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr.

Bush, Mr. Weissburg, Mr. Johnston, Mr. Peters, IDS, ISI TAVAS, Byzfunder, Newco, Mr.

Vakil, Wise, Mr. Markowitz, Samson, Cloudfund, Unique, Mr. Winograd, and Prosperum

violated Section 1962(d) when they conspired to commit the above described actions.

178.    18 U.S.C. Section 1964(c) of RICO provides a private right of action for financial

damages suffered by a business or individual arising from a violation of Section 1962. Plaintiffs

suffered losses and demand damages as provided by Section 1964(c).

## Count Four: Fraud in the Inducement

179.    Plaintiffs adopt and incorporate all prior allegations by reference.

180.    To induce Mr. Littrell and his businesses to execute the Initial Engagement and second

Service Agreement, IDS, ISI and TAVAS, by and through the actions of their employees, agents

and representatives, Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr.

Weissburg, Mr. Johnston,  and Mr. Peters, represented they would provide valuable business

management and consulting services. This representation was knowingly false when made. IDS,

ISI, and TAVAS had no present intent to perform.

181.    To induce Mr. Littrell and his businesses to execute the Initial Engagement and second

Service Agreement, IDS, ISI and TAVAS, by and through the actions of their employees, agents

and representatives, Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr.

Weissburg, Mr. Johnston, and Mr. Peters, represented they would not engage in self-dealing and

only pursue the best interests of its clients. This representation was knowingly false when made. IDS, ISI, and TAVAS had no present intent to perform.

182.    To induce Mr. Littrell and his businesses to execute the Initial Engagement and second Service Agreement, IDS, ISI and TAVAS, by and through the actions of their employees, agents and representatives, Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, and Mr. Peters, gave ironclad assurances: Mr. Littrell and his businesses would make twice the amount IDS, ISI, and TAVAS charged for its services or receive a full refund. This representation was knowingly false when made. IDS, ISI, and TAVAS had no present intent to perform.

183.    To induce Mr. Littrell and his businesses to execute the Initial Engagement, IDS, ISI and TAVAS , by and through the actions of their employees, agents and representatives, Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, and Mr. Peters, represented they were covered by a $2,000,000 bond. This representation was knowingly false when made. IDS, ISI and TAVAS had no such bond or surety.

184.    To induce Mr. Littrell and his businesses to execute the MCAs described herein, IDS, ISI and TAVAS ,  Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, and Mr. Peters, Byzfunder, NewCo, Mr. Vakil, Wise, Mr. Markowitz, Samson, Cloudfund, Unique, Mr. Winograd, and Prosperum each represented their "Revenue Purchase Agreement" was not an MCA, the interest rate they charged was not usurious, and the fixed-rate payments they required were a good faith estimate of the value of future receivables. These representations were knowingly false when made.

185.    To induce Mr. Littrell and his businesses to execute the second Service Agreement, IDS, ISI and TAVAS , by and through the actions of their employees, agents and representatives, Mr.

Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston,

and Mr. Peters represented it had no prior association with Penhurst. This representation was

knowingly false when made. Ms. Etoh was the director, president, treasurer, and secretary of

Penhurst from at least October 22, 2020, until February 22, 2022.

186.    But for Defendants' fraud in the inducement, Plaintiffs would not have executed the

Initial Engagement, the second Service Agreement, or the series of MCA instruments, and Mr.

Littrell would not have personally secured each of the MCA loans.

187.    IDS, ISI and TAVAS, by and through the actions of their employees, agents and

representatives, Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr.

Weissburg, Mr. Johnston, and Mr. Peters fraudulently represented to Jason Littrell, Littco, and

Littco Metals that the only option available was to seek an "order for liquidation" and to transfer

the assets of Littco Metals to another company. They falsely represented the only way to save his

company was for Jason to transfer or forfeit his control, stock, interests, and other assets to IDS,

ISI, and related entities and individuals.

188.    Plaintiffs suffered losses as a direct and proximate result of Defendant's acts of fraud in

the inducement, and demand all available damages.

### Count Five: Negligent/Fraudulent Misrepresentation

189.    Plaintiffs adopt and incorporate all prior allegations by reference.

190.    At the inception of the Initial Engagement, IDS, ISI and TAVAS, by and through the

actions of their employees, agents and representatives, Mr. Burgess, Ms. Etoh, Mr. Willits, Mr.

Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, and Mr. Peters represented that Mr.

Littrell and his businesses would never qualify for financing from a traditional lender then began

taking steps to secure the payment of their fees by means of a venture capital loan. This

representation was knowingly false when made. At a minimum, it was negligent or grossly
negligent.

191.    During the performance of the Initial Engagement and second Service Agreement, IDS,
ISI and TAVAS, by and through the actions of their employees, agents and representatives, Mr.
Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston,
and Mr. Peters represented to Mr. Littrell and his businesses that they should continue to trust the
process and follow all business and financial advice they were given. These representations were
knowingly false when made. At a minimum, they were negligent or grossly negligent.

192.    During the performance of the Initial Engagement and second Service Agreement, IDS,
ISI and TAVAS, by and through the actions of their employees, agents and representatives, Mr.
Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston,
and Mr. Peters repeatedly represented to Mr. Littrell and his businesses that they were taking
material steps to improve the cash flow of Littco and Littco Metals. These representations were
knowingly false when made. At a minimum, they were negligent or grossly negligent.

193.    During the performance of the Initial Engagement and second Service Agreement, IDS,
ISI and TAVAS, by and through the actions of their employees, agents and representatives, Mr.
Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston,
and Mr. Peters repeatedly represented to Mr. Littrell and his businesses that the ironclad
assurance of profitability they received at the outset only applied if they followed IDS's advice.
These representations were knowingly false when made. IDS never had the intent to perform.

194.    In conjunction with the procurement of the MCAs, IDS, ISI and TAVAS , Mr. Burgess,
Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, and Mr.

Peters, Byzfunder, NewCo, Mr. Vakil, Wise, Mr. Markowitz, Sampson, Cloudfund, Unique, Mr.

Winograd, and Prosperum negligently or fraudulently misrepresented:

a)    The true nature of the transactions;

b)    That they were not loans;

c)    That they were not usurious or illegal;

d)    That they charged hidden fees;

e)    That they would drain Plaintiffs of money;

f)    That they unconscionably waived substantive legal rights; or

g)    That they would place the Plaintiffs into a hopeless debt cycle with no other

outcome than bankruptcy and financial ruin.

195.    Plaintiffs reasonably relied upon Defendants' material misrepresentations, suffered losses

as a direct and proximate result of same, and demand all available damages.

## Count Six: Negligence and Gross Negligence

196.    Plaintiffs adopt and incorporate all prior allegations by reference.

197.    Through negligence and/or gross negligence, IDS, ISI, TAVAS, Mr. Burgess, Ms. Etoh,

Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, and Mr. Peters were

incapable of providing valuable business management and consulting services.

198.    During the entirety of their dealings with Mr. Littrell and his businesses, IDS, ISI,

TAVAS, Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg,

Mr. Johnston, and Mr. Peters failed to exercise that degree of diligence and expertise the public

is entitled to expect of entities that claim to provide professional business managers and

consultants.

199.    Through negligence and/or gross negligence, IDS, ISI, TAVAS, Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, and Mr. Peters were incapable of offering valuable legal, accounting, business and financial advice.

200.    During the entirety of its dealings with Mr. Littrell and his businesses, IDS, ISI, TAVAS, Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston, and Mr. Peters failed to exercise that degree of diligence and expertise the public is entitled to expect of an entity that claims to provide reputable and professional lawyers, accountants, and financial advisors.

201.    Plaintiffs suffered losses as a direct and proximate result of Defendants' negligence and/or gross negligence, and demand all available damages.

## Count Seven: Breach of Contract and UCC Violations

202.    Plaintiffs adopt and incorporate all prior allegations by reference.

203.    IDS, ISI and TAVAS breached the Initial Engagement and second Service Agreement, the implied duty of good faith and fair dealing inherent in all contracts, and the explicit good faith and fair dealing requirement of the UCC in at least the following material ways:

a)  It failed to provide valuable business management and consulting services;

b)  It failed to consider the best interests of Mr. Littrell and his businesses;

c)  It engaged in acts of fraud and blatant self-dealing;

d)  It procured usurious loans for Mr. Littrell and his businesses;

e)  It accepted undisclosed financial benefits from predatory lenders;

f)  It increased debt and monthly debt service obligations without good cause; and

g)  It failed to provide accurate, reliable, and up-to-date VERs and CMRs.

204.    Byzfunder, NewCo, Mr. Vakil, Wise, Mr. Markowitz, Sampson, Cloudfund, Unique, Mr.

Winograd, and Prosperum breached the MCAs, the implied duty of good faith and fair dealing

inherent in all contracts, and the explicit good faith and fair dealing requirement of the UCC in at

least the following material ways:

    a)    They failed to provide valuable services;

    b)    They failed to consider the best interests of Mr. Littrell and his businesses;

    c)    They engaged in acts of fraud and blatant self-dealing;

    d)    They were in fact usurious loans for Mr. Littrell and his businesses;

    e)    They provided undisclosed financial benefits to other Defendants;

    f)    They increased debt and monthly debt service obligations without good cause;

    g)    They obtained undisclosed fees and charges; and

    h)    They unconscionably waived substantive legal rights.

205.    The provisions of Article 9 of the UCC explicitly encompass both sales of receivables

and security interests in receivables. *See* Miss. Code § 9-102.

### Count Eight: Tortious/Intentional Interference

206.    Plaintiffs adopt and incorporate all prior allegations by reference.

207.    IDS, ISI and TAVAS , Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr.

Bush, Mr. Weissburg, Mr. Johnston,  and Mr. Peters, Byzfunder, NewCo, Mr. Vakil, Wise, Mr.

Markowitz, Sampson, Cloudfund, Unique, Mr. Winograd, and Prosperum tortiously and/or

intentionally interfered with the performance of contracts between Littco, Littco Metals, and

their customers.

208.    IDS, ISI and TAVAS , Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr.

Bush, Mr. Weissburg, Mr. Johnston,  and Mr. Peters, Byzfunder, NewCo, Mr. Vakil, Wise, Mr.

Markowitz, Sampson, Cloudfund, Unique, Mr. Winograd, and Prosperum tortiously and/or intentionally interfered with the business relations between Littco, Littco Metals, and their customers.

209.    Plaintiffs suffered losses as a direct and proximate result of Defendants' acts of tortious and/or intentional interference, and demand all available damages.

## Count Nine: Conversion

210.    Plaintiffs adopt and incorporate all prior allegations by reference.

211.    IDS, ISI and TAVAS , Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston,  and Mr. Peters, Byzfunder, NewCo, Mr. Vakil, Wise, Mr. Markowitz, Sampson, Cloudfund, Unique, Mr. Winograd, and Prosperum wrongfully (1) took possession of, (2) exercised dominion in exclusion or defiance of the owners' rights, (3) made unauthorized and injurious use, or (4) wrongfully detained after demand money loaned to Mr. Littrell and his businesses. The Defendants committed the tort of conversion.

212.    IDS, ISI and TAVAS , Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr. Bush, Mr. Weissburg, Mr. Johnston,  and Mr. Peters, Byzfunder, NewCo, Mr. Vakil, Wise, Mr. Markowitz, Sampson, Cloudfund, Unique, Mr. Winograd, and Prosperum wrongfully (1) took possession of, (2) exercised dominion in exclusion or defiance of the owners' rights, (3) made unauthorized and injurious use, or (4) wrongfully detained after demand converted money, company shares, and company stock. The Defendants committed the tort of conversion.

213.    Plaintiffs suffered losses as a direct and proximate result of Defendants' acts of conversion, and demand all available damages.

## Count Ten: Civil Conspiracy

214.    Plaintiffs adopt and incorporate all prior allegations by reference.

215.   IDS, ISI and TAVAS, Mr. Burgess, Ms. Etoh, Mr. Willits, Mr. Free, Mr. Legon, Mr.

Bush, Mr. Weissburg, Mr. Johnston, and Mr. Peters, Byzfunder, NewCo, Mr. Vakil, Wise, Mr.

Markowitz, Sampson, Cloudfund, Unique, Mr. Winograd, and Prosperum reached an agreement

regarding a course of action or object to be accomplished and took one or more unlawful overt

acts in furtherance of that agreement to the detriment of Mr. Littrell and his businesses.

216.   Defendants conspired together to violate Mississippi law and public policy, including

state usury laws. They conspired to use abusive, deceptive, unfair, and unconscionable tactics.

217.   Plaintiffs suffered losses as a direct and proximate result of Defendants' unlawful and

conspiratorial conduct, and demand all available damages.

### Count Eleven: Exercise of Avoiding and Other Powers

218.   Plaintiffs adopt and incorporate all prior allegations by reference.

219.   The Trustee brings this adverse action, in part, to object to and to disallow the claims

asserted by Defendants in the underlying bankruptcy case pursuant to § 502(b)(1) on the grounds

they are unenforceable under applicable law and violate applicable usury laws. This is an action

to avoid the transfer of property of the Debtor, and to avid and purported lien of Defendants

pursuant to §§ 105, 501, 502, 506, 510, 544, 547, 548, 550, 551, and 1123(b)(5) of the

Bankruptcy Code and Rules 3007 and 7001 of the Bankruptcy Rules.

220.   The Trustee seeks to set aside preferential transfers made to creditors within 90 days

before the petition and to undo security interests and other prepetition transfers of property that

were not properly perfected.

221.   The Trustee requests the Court disallow, set aside, reduce, modify or eliminate the proof

of claim [23-10069-SDM] [Doc. 30-1] filed by ISI on April 19, 2023, for $1,038,915.29 on

grounds it is unenforceable under applicable law. Additionally, the money stated in the proof of

claim was used in a preferential transfer of funds to IDS, ISI, or related entities and individuals.

Additionally, IDS, ISI, and related entities and individuals improperly transferred money, stock,

shares, and other assets of Plaintiffs.

222.   The Trustee requests the Court disallow, set aside, reduce, modify or eliminate the proof

of claim [23-10069-SDM] [Doc. 3-1] filed by Samson on January 18, 2023, for $1,312,963.60 on

grounds it is unenforceable under applicable law and violates public usury laws.

223.   The Trustee requests the Court disallow, set aside, reduce, modify or eliminate the proof

of claim [23-10069-SDM] [Doc. 4-1] filed by Byzfunder on January 18, 2023, for $214,574.37

on grounds it is unenforceable under applicable law and violates public usury laws.

224.   The payments made to Defendants are identified in this Second Amended Complaint and

incorporated herein. These payments constitute transfers. The transfers were made for the benefit

of Defendants. The transfers were on account of an antecedent debt owed by Plaintiffs prior to

the transfer. The transfers were made while Plaintiffs were insolvent. The transfers enabled

Defendants to receive more from Plaintiffs than they would have otherwise received. The

transfers are avoidable as a preference pursuant to 11 U.S.C. § 547.

225.   Defendants were insiders of Littco and Littco Metals pursuant to 11 U.S.C. §

101(31)(B)(iii) and 101(31)(F) as they were in control of the operations and assets of these

entities. The assignments, contracts, transfer of shares and interests, appointment of executives,

and other actions created a principal/agent and fiduciary relationship that makes Defendants

insiders under Section 101(31).

226.   Pursuant to 11 U.S.C. §§ 547 and 551, the Trustee is entitled to void the transfers and

preserve the property transferred for the benefit of the estate. Pursuant to 11 U.S.C. §§ 547, 550,

and 551, the Trustee is entitled to recover a money judgment against Defendants.

227.    Pursuant to Section 506(d), because the purported liens of Defendants are not secured claims, they are void, and the property interest so recovered is preserved for the benefit of the bankrupt estate under Section 551.

228.    Alternatively, the Trustee asks the Court to void the transfers because the payments made by Plaintiffs were constructive fraudulent transfers pursuant to U.S.C. § 548(a)(1)(B). The transfers were made within two years before the date of the filing of Littco Metals' Petition, and this debtor received less than a reasonable equivalent in exchange for the transfer.

229.    In the alternative, if the Court determines that the transfers were not made on account of antecedent debts owing to Defendants, then any claim of Defendants should be re-characterized as an equity contribution to Plaintiffs. Any equitable contribution was improperly and illegally for the benefit to Defendants, not Plaintiffs.

DAMAGES

230.    Plaintiffs adopt and incorporate all prior allegations by reference.

231.    Plaintiffs demand the following damages:

    a)  Actual, consequential, and special damages as may be proven at trial;

    b)  All damages recoverable under Miss. Code § 75-17-25;

    c)  All damages recoverable under 18 U.S.C. § 1864(c); and

    d)  Punitive damages, attorney fees, costs, expenses, and pre- and post-judgment interest.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray for an award of general and specific relief consistent with the facts and claims alleged herein.

Respectfully submitted,

JASON LITTRELL, LITTCO, LLC, and WILLIAM L.
FAVA, TRUSTEE FOR LITTCO METALS, LLC

*/s/ Goodloe T. Lewis*
GOODLOE T. LEWIS, MSB #9889
LAWRENCE J. TUCKER, JR., MSB #100869
BRIAN A. CLARK, MSB #100736
Hickman, Goza & Spragins, PLLC
P.O. Drawer 668
Oxford, MS 38655
(662) 234-4000 (telephone)
(662) 234-2000 (facsimile)
glewis@hickmanlaw.com
ltucker@hickmanlaw.com
bclark@hickmanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Goodloe T. Lewis of Hickman, Goza & Spragins, PLLC, Oxford, Mississippi, do

hereby certify that I have, this date, filed the above with the Court and delivered a copy to all

parties requesting notice by using the ECF filing system.

DATE: March 7, 2025

_/s/ Goodloe T. Lewis_
GOODLOE T. LEWIS
